# NO. 12-14-00123-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *LIBERTY MUTUAL INSURANCE COMPANY,*<br>*APPELLANT* | § | *APPEAL FROM THE 273RD* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *RICKIE SIMS,*<br>*APPELLEE* | § | *SHELBY COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Liberty Mutual Insurance Company appeals the trial court's entry of a $1,000,000.00 judgment against it following a jury trial. Liberty raises four issues on appeal. We reverse and remand.

### BACKGROUND

This case arose from an automobile accident involving Rickie Sims and Aryka Knous. At the time of the accident, Sims was operating a commercial vehicle owned by his employer, Nomac Drilling, an affiliate of Chesapeake Energy Corporation. Knous had automobile liability insurance with a $100,000.00 policy limit. Liberty provided commercial auto coverage to Chesapeake, including uninsurance/underinsurance (UM/UIM) benefits. It is undisputed that Sims was a covered person under Chesapeake's policy. Additionally, Sims had a personal automobile liability policy, issued by Farmers Texas County Mutual Insurance Company, that included UM/UIM benefits.

Sims filed suit against Knous, Liberty, and Farmers. In its initial responses to Sims's discovery requests, Liberty admitted that the Chesapeake policy had UIM limits of $1,000,000.00. In supplemental discovery responses delivered to Sims several months before trial, Liberty produced an amendatory endorsement and amended schedule of limits that

purported to lower Chesapeake's UIM coverage to $250,000.00. Liberty explained that it had mistakenly responded that Chesapeake's UIM policy limits were $1,000,000.00 and that $250,000.00 was the correct amount as shown by the amending documents.

Knous's carrier settled with Sims for its $100,000.00 liability limits, and the case proceeded to trial against Liberty.[1] Eleven days before jury selection was to begin, Liberty tendered the $250,000.00 UIM limits it contended were available under the Chesapeake policy. Five days before trial, Sims moved for leave to file an amended petition alleging for the first time that Chesapeake's UIM limits were $1,000,000.00 and asserting new damage claims against Liberty based on violations of the Texas Insurance Code. The trial court, over Liberty's objections, allowed Sims to file his amended petition. At trial, the primary issue was Liberty's contractual obligation, if any, to pay Sims under the UIM provisions of the Chesapeake policy.[2]

Before jury selection, Liberty submitted its supplemental discovery responses and the Chesapeake policy with the amendatory endorsement and UIM schedule to the court. Based on these documents, Liberty requested the trial court to rule, as a matter of law, that the UIM limits under Chesapeake's policy were $250,000.00. Liberty also filed a motion in limine to preclude evidence of the amount of the policy's UIM limits from being presented to the jury. The trial court declined to rule on Liberty's request to determine the Chesapeake policy's UIM limits as a matter of law, and the case proceeded to jury selection.

During opening statements, Sims was permitted to assert to the jury, over Liberty's objection, that the UIM limits were $1,000,000.00. In his case-in-chief, Sims introduced the Chesapeake policy without the amendatory endorsement as well as Liberty's initial discovery responses stating that the UIM limits were $1,000,000.00. Liberty sought to introduce the amendatory endorsement, the amended UIM schedule, and Liberty's supplemental discovery responses. Sims objected, and the court sustained his objections. During the charge conference, the trial court overruled Liberty's objection to Sims's proposed jury question about the amount of available UIM benefits under the Chesapeake policy. The jury found the applicable UIM limits were $1,000,000.00 and that Sims's total bodily injury damages were $2,540,885.47.

[1] Farmers entered into a "high-low" agreement with Sims and did not participate in the trial. A high-low agreement is a settlement in which a defendant agrees to pay the plaintiff a minimum recovery in return for the plaintiff's agreement to accept a maximum amount regardless of the outcome of the trial. *See John A. Broderick, Inc. v. Kaye Bassman Int'l Corp.*, 333 S.W.3d 895, 905 (Tex. App.—Dallas 2011, no pet.).

[2] The trial court severed Sims's extra-contractual claims from the contractual claims for UIM benefits. Liberty later removed the severed extra-contractual claims to federal court.

Liberty filed a combined motion to disregard jury answers, motion for judgment notwithstanding the verdict (JNOV), and objection to Sims's motion for judgment. Liberty attached to its motion a certified copy of the entire Chesapeake policy with the amendatory endorsements and amended UIM limits schedule. Liberty again requested that the trial court rule as a matter of law, after construing the entire Chesapeake policy, that the UIM policy limits were $250,000.00. The trial court rendered judgment against Liberty for $1,000,000.00. Liberty's subsequent motion for new trial was overruled by operation of law. This appeal followed.

**CHESAPEAKE POLICY UIM LIMITS**

In its first issue, Liberty argues that the trial court erred by failing to find the UIM limits of the Chesapeake policy were $250,000.00 as a matter of law, allowing evidence of the amount of the UIM limits to be presented to the jury, and submitting a jury issue on the amount of the UIM limits.

In its second issue, Liberty argues that the amount of the policy's UIM limits was not relevant to any fact issue to be decided by the jury, and was material only to calculating the amount of the judgment after the verdict. Since these issues are related, we address them together.

**Standard of Review**

General rules of contract interpretation and construction govern a court's review of an insurance policy. *See **Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co***., 141 S.W.3d 198, 202 (Tex. 2004); ***Trinity Universal Ins. Co. v. Cowan***, 945 S.W.2d 819, 823 (Tex. 1997). The interpretation of the terms of an insurance contract is a question of law that we review de novo. ***Nautilus Ins. Co. v. Steinberg***, 316 S.W.3d 752, 755 (Tex. App.—Dallas 2010, pet. denied). When conducting a de novo review, the reviewing court exercises its own judgment, determines each issue of fact and law, and accords the original court's decision no deference. *See **Quick v. City of Austin***, 7 S.W.3d 109, 116 (Tex. 1998).

A contract is unambiguous as a matter of law if the court can give it a definite legal meaning. ***State Farm Fire and Cas. Co. v. Vaughan***, 968 S.W.2d 931, 933 (Tex. 1998); ***Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.***, 907 S.W.2d 517, 520 (Tex. 1995). If an insurance contract is subject to more than one reasonable interpretation, it is ambiguous and the courts will apply the interpretation that most favors the existence of coverage. ***Plantation Pipe Line Co. v.***

*Highlands Ins. Co.*, 444 S.W.3d 307, 311 (Tex. App.—Eastland 2014, pet. filed). However, an ambiguity does not exist simply because the parties take differing and conflicting positions regarding the proper interpretation of the contract. *Id.*; *see Kelley-Coppedge Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 465 (Tex. 1998). A trial court errs when it does not construe an unambiguous provision as a matter of law and instead submits the issue to a fact finder. *Lambrecht & Assocs., Inc. v. State Farm Lloyds*, 119 S.W.3d 16, 21 (Tex. App.—Tyler 2003, no pet.).

## Applicable Law

UIM coverage provides payment to the insured of all amounts that the insured is legally entitled to recover as damages from owners or operators of underinsured motor vehicles because of bodily injury or property damage. TEX. INS. CODE ANN. § 1952.106 (West 2009). The insured's recovery, if any, under UIM coverage cannot exceed the limits specified in the insurance policy and is reduced by the amount recovered or recoverable from the insurer of the underinsured vehicle. *Id.* Texas law requires that a party seeking recovery against an insurance company for injuries resulting from the negligence of a UIM must plead and prove that, at the time of the accident, the party was protected by UIM coverage. *Member's Mut. Ins. Co. v. Olguin*, 462 S.W.2d 348, 350 (Tex. Civ. App.—El Paso 1970, no writ). The UIM insurer is under no contractual duty to pay benefits until the insured obtains a judgment establishing the liability and the underinsured status of the other motorist. *Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809, 815 (Tex. 2006).

A motorist is underinsured if the available proceeds of his liability insurance are insufficient to compensate for the injured party's actual damages. *Stracener v. United Servs. Auto. Ass'n*, 777 S.W.2d 378, 380 (Tex. 1989). Therefore, to recover UIM benefits, Sims had the burden to prove he had UIM coverage, Knous's negligence proximately caused his damages and the amount of his damages, and Knous's motor vehicle was underinsured. *See In re Reynolds*, 369 S.W.3d 638, 652 (Tex. App.—Tyler 2012, orig. proceeding).

Endorsements to an insurance policy generally supersede and control over conflicting printed terms within the main policy. *Mesa Operating Co. v. Cal. Union Ins. Co.*, 986 S.W.2d 749, 754 (Tex. App.—Dallas 1999, pet. denied). However, insurance policies and their endorsements should be construed together unless they are so much in conflict that they cannot be reconciled. *Id.* It is well established in Texas that endorsements attached to a policy, when

4

delivered, are properly treated as a part of the policy even though not independently signed, because the policy signatory is inclusive of all endorsements. *French v. Ins. Co. of N. Am.*, 591 S.W.2d 620, 621 (Tex. App.—Austin 1979, no writ); *Anderson v. Aetna Cas. & Sur. Co*., 432 S.W.2d 151, 153 (Tex. Civ. App.—Fort Worth 1968, writ ref'd n.r.e.). While endorsements should be attached to insurance policies, the failure to do so does not invalidate them. *See Fidelity Union Life Ins. Co. v. Methven*, 346 S.W.2d 797, 800 (Tex. 1961); *see also Am. Gen. Life Ins. Co. v. Kirsh*, 378 Fed. Appx. 379, 385 (5th Cir. 2010). Texas law has long provided that a separate contract can be incorporated into an insurance policy by an explicit reference clearly indicating the parties' intention to include that contract as part of their agreement. *Urrutia v. Decker*, 992 S.W.2d 440, 442 (Tex. 1999).

**Discussion**

Liberty asserts that the terms of the Chesapeake policy are unambiguous and show, as a matter of law, that its UIM coverage limits were $250,000.00. Sims did not plead in the trial court, and does not assert in his brief, that the policy or its terms relating to the UIM limits are ambiguous. Rather, Sims claims there is a factual dispute about whether Liberty's attempt to lower the UIM policy limits through the amendatory endorsement "was ever effectuated."

We begin our analysis by reviewing the Chesapeake policy de novo to determine whether the UIM coverage limits terms are ambiguous.[3] The policy, which is in the record before us, is identified as Commercial Policy No. AS1-691-522861-031. The policy number and its effective and expiration dates are stamped on each section and endorsement of the policy. The first section of the policy is entitled "Business Auto Declarations." ITEM ONE of this portion identifies "Chesapeake Energy Corporation and as per Named Endorsement" as the named insured and reflects a policy period from July 1, 2011, to July 1, 2012. ITEM TWO references documents "Attached Immediately After this Page." The next page of the Business Auto Declarations contains a "Schedule of Coverages and Covered Autos" that identifies the coverage amount and several other attached schedules that apply to the policy. The first of these schedules is form number "GPO 4877 1207," entitled "Uninsured/Underinsured Motorist Insurance (UM/UIM) Schedule," which reflects UIM coverage limits of $1,000,000.00. Just above the

---

[3] Though various portions of the Chesapeake policy were offered by both parties before and during the trial and are contained within the record, our references to the policy will be from the certified copy attached to Liberty's motion for judgment notwithstanding the verdict.

itemized amounts of coverage, the policy states "Note: Applicable endorsements may reduce the amount payable to less than the stated limit of insurance."

The Business Auto Declarations section is followed by a "Composite Rating Schedule," "Forms Inventory," "Named Insured Endorsement," and "Named Insured Schedule." The next page, entitled "Common Policy Conditions," states that "[a]ll Coverage Parts included in this Policy are subject to the following conditions . . . [including that] [t]his policy's terms can be amended or waived only by endorsement issued by us and made a part of the policy."

The last section of the policy contains the relevant amendatory endorsement, which is identified as "2610A-Amendatory Endorsement." As with the other endorsements, the policy number and its effective and expiration dates are stamped on this endorsement. The endorsement is further identified as "Chesapeake Energy Corporation and as per Named Insured." Underneath the title "Amendatory Endorsement" is the phrase "Premium Adjustment," followed by the statement, "It is agreed the GPO 4877 1207-[UIM] Schedule is cancelled and replaced with the attached schedule." The 2610A-Amendatory Endorsement also states that "[i]t is further agreed that the policy is amended to include the enclosed Endorsements." Thereafter, the amended schedule of UIM coverage limits identifies the Chesapeake policy number and lists UIM coverage limits of $250,000.00. Finally, the Forms Inventory, which identifies the correct policy number, lists the amended forms that apply as a "part of this policy at inception," including the 2610A-Amendatory Endorsement and amended schedule of UIM coverage limits.

Our review of the Chesapeake policy reveals no ambiguity pertaining to UIM coverage limits. Amendatory Endorsement 2610A and the attached documents, in plain and unambiguous language, establish UIM limits of $250,000.00. These documents reference the Chesapeake policy by number and policy period, and reflect that they are effective as of the policy's inception date (July 1, 2011). The endorsement's statement that UIM limits are $250,000.00 controls over the main policy's UIM limits of $1,000,000.00. *See **Mesa Operating Co.***, 986 S.W.2d at 754. The stated reason for the amendatory endorsement was a premium adjustment, and the language in the amendatory endorsement reflects Liberty's and Chesapeake's intention to amend the policy as set forth in the endorsement. Since the language of the policy can be given a certain and definite legal meaning that the UIM coverage limits were $250,000.00, it is

6

unambiguous as a matter of law. *See **Vaughan***, 968 S.W.2d at 933; ***Nat'l Union Fire Ins. Co.***, 907 S.W.2d at 520.

**Sims's Responsive Arguments**

In his brief, Sims raises several argument in support of the trial court's judgment. We address each of these arguments in turn.

### 1. Liberty's Discovery Responses

Sims argues that discrepancies in Liberty's discovery responses and the various versions of the Chesapeake policy produced throughout the litigation created a fact issue for the jury as to the UIM policy limits. Specifically, Sims contends that Liberty's initial sworn interrogatory answers, its response to his request for admissions, and its failure to initially produce Amendatory Endorsement 2610A created confusion and suspicion, which required the jury to determine the UIM limits. Similarly, Sims argues that Liberty's failure to seek leave from the trial court to withdraw its initial request for admission response that the Chesapeake policy had $1,000,000.00 UIM limits precludes it from contending at trial that the actual limits were less.

Liberty sought to correct its mistake by amending its response to the request for admission one day before trial without seeking leave of court. However, approximately three months before trial, Liberty amended its response to an interrogatory and request for production covering the same subject matter. In the amendment of those responses, Liberty explained that its previous response was incorrect and that UIM coverage limits for the Chesapeake policy were $250,000.00. Moreover, Liberty attached the relevant amendments to the policy as part of its amended response. Liberty also offered to settle the UIM case for the policy limits of $250,000.00. Consequently, Sims had notice that Liberty contended the UIM policy limits were $250,000.00. Yet he relied on Liberty's initial admission at trial to conclusively prove, as a judicial admission, that the UIM limits were $1,000,000.00.[4]

A party must supplement its written discovery responses if its response was incorrect when made. *See* TEX. R. CIV. P. 193.5(a). Written discovery includes responses to interrogatories and responses to requests for admission. TEX. R. CIV. P. 192.7(a). However, a party is not required to supplement its response when the information is made known to the other party in writing, on the record at a deposition, or through other discovery responses. *See* TEX. R.

---

[4] Responses to requests for admission are treated as judicial admissions. *See* TEX. R. CIV. P. 198.3; ***Marshall v. Vise***, 767 S.W.2d 699, 700 (Tex.1989).

CIV. P. 193.5(a)(2). A party need only serve an amended response to an interrogatory "reasonably promptly." *See* TEX. R. CIV. P. 193.5(b). In amending a response to a request for admission, however, a party may substitute a new response by showing (1) good cause for the substitution, (2) that the party relying on the response will not be unduly prejudiced, and (3) that the presentation of the merits of the action will be preserved. *See* TEX. R. CIV. P. 198.3; *Stelly v. Papania*, 927 S.W.2d 620, 621-22 (Tex. 1996) (holding that rule applies not only to deemed admissions, but also to parties seeking to substitute new response for prior response). Liberty did not file a motion to amend its response or attempt to demonstrate these elements to the trial court.

However, responses to requests for admissions are intended to be used by the parties to simplify trials by eliminating matters about which there is no real controversy. *Marino v. King*, 355 S.W.3d 629, 632 (Tex. 2011). They should not be used to require an opposing party to admit claims and concede defenses that a party knows are being disputed. *See id.* Courts have cautioned that litigants should not be allowed to use requests for admissions as a tool to trap their opposition. *See, e.g., Birdo v. Hammers*, 842 S.W.2d 700, 701 (Tex. App.—Tyler 1992, writ denied). Due process bars merit-preclusive sanctions such as when a party seeks to use a previous admission or attempts to prevent a party from changing a previous admission through amendment or supplementation to preclude presentation of the merits of a case. *See Wheeler v. Green*, 157 S.W.3d 439, 443 (Tex. 2005); *see also Time Warner, Inc. v. Gonzalez*, 441 S.W.3d 661, 665-66 (Tex. App.—San Antonio 2014, pet. denied) (holding due process concerns warranted withdrawal of deemed admission because trial court prevented party subject to admission from offering relevant evidence contrary to deemed admission, and it was clear that admission prevented presentation of the merits of the case).

Sims received notice in writing through Liberty's amendment to its responses to interrogatories and request for production that Liberty contended the policy limits were $250,000.00. The amendment did not require a motion or leave of court under these facts. *See* TEX. R. CIV. P. 193.5(a)(2). Consequently, Liberty was excused from supplementing its response to the request for admission. *See id.* And although a response to a request for admission normally functions as a judicial admission, it is ineffective for resolving questions of law such as the construction of an unambiguous contract. *See Boulet v. State*, 189 S.W.3d 833, 838 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (stating that rule regarding request for

admissions does not contemplate or authorize admissions to questions involving points of law); ***Gore v. Cunningham***, 297 S.W.2d 287, 291 (Tex. Civ. App.—Beaumont 1956, writ ref'd n.r.e.) (same); *see also **Elliott v. Newsom***, No. 01-07-00692-CV, 2009 WL 214551, at *2 (Tex. App.—Houston [1st Dist.] Jan. 29, 2009, no pet.) (mem. op.) (holding purchaser's response to real estate broker's request for admission in contravention of terms of contract was ineffective as judicial admission because admission pertained to contract construction, which is question of law, and terms of unambiguous contract controlled).

In any event, mistakes made by Liberty in its discovery responses and production of the Chesapeake policy do not change the trial court's obligation to review and make a legal determination of the policy's terms and UIM limits. An insurer's mistaken belief about coverage limits does not require that the higher coverage be extended. *See **Tex. Farmers Ins. Co. v. McGuire***, 744 S.W.2d 601, 602-03 (Tex. 1988) (holding that doctrine of waiver and estoppel cannot be used to create insurance coverage); *see also **Asfahani v. State Farm Mut. Auto. Ins. Co.***, No. EP-05-CA-110-FM, 2006 WL 488401, at *3–4 (W.D. Tex. Jan. 13, 2006) (mem. op., not designated for publication) (holding claimant failed to raise fact issue in summary judgment case where insurance company mistakenly responded to interrogatories and identified higher amount of UIM limits than those stated in policy, because policy sets terms of coverage, not responses to interrogatories).

In summary, Liberty's responses to discovery do not create a fact issue that would warrant submission of the UIM limits to the jury. Liberty was not required to seek leave of court to amend its responses because Sims received notice of the policy limits in writing through Liberty's amended response to Sims's interrogatories and request for production. And even if supplementation were required, the issue ultimately is irrelevant because we have held that the policy is unambiguous and that the UIM policy limits are $250,000.00 as a matter of law. Consequently, the admission is ineffective to serve as a judicial admission that the limits are $1,000,000.00.[5]

### 2. The certified policy's inclusion in the record

Sims next argues that the submission of the certified policy, which includes Amendatory Endorsement 2610A, as part of Liberty's post-verdict motion was untimely and cannot be

---

[5] In light of this conclusion, we do not address Liberty's argument that Sims waived reliance on the admission to establish UIM limits as a matter of law by submitting the issue of UIM policy limits to the jury. *See* TEX. R. APP. P. 47.1.

considered by the court. As support, Sims cites Texas Rule of Civil Procedure 270, which states that in a jury case, no evidence on a controversial matter shall be received after the jury's verdict. *See* TEX. R. CIV. P. 270. He contends the issues of UIM coverage limits and credits must be addressed prior to the jury's determining liability and damages. The failure to do so, he urges, precludes the court from considering UIM coverage limits or any credits that the UIM carrier would be entitled to. Sims does not consider, however, that Amendatory Endorsement 2610A was accepted by the trial court as Court's Exhibit No. 1 prior to jury selection. Therefore, even if Liberty had not attached a copy of the entire Chesapeake policy to its postverdict motion, Amendatory Endorsement 2610A was before the court for consideration when it was asked to rule, as a matter of law, on the UIM coverage limits.

Sims also contends that the certified policy attached to Liberty's motion for JNOV is hearsay. However, Sims failed to obtain a ruling on his hearsay objection. Thus, Sims waived his right to complain on appeal that the certified policy is not properly before this court or that the trial court's final judgment was an "implied" ruling on his hearsay objection. *See Gaspar v. Lawnpro, Inc.*, 372 S.W.3d 754, 756-57 (Tex. App.—Dallas 2012, no pet.); *S & I Mgmt., Inc. v. Choi*, 331 S.W.3d 849, 855 (Tex. App.—Dallas 2011, no pet.).

Moreover, a UIM insurer has no contractual duty to pay benefits until after the liability of the insured and the other motorist, as well as the damages suffered by the insured, have been determined. *Brainard*, 216 S.W.3d at 815. Not until that time is the trial court required to take up the amount of UIM coverage limits, the other motorist's liability limits, and any payments made by the UIM carrier. *See Mid-Century Ins. Co. of Tex. v. McLain*, No. 11-08-00097-CV, 2010 WL 851407 at *1, 3 (Tex. App.—Eastland Mar. 11, 2010, no pet.) (mem. op.). Implicit in this rule is that, after the jury's verdict, one or both parties will present evidence to the court on UIM coverage limits, liability policy limits of the other motorist, and any other payments received by the insured for which the UIM carrier is entitled to credit. This information is necessary for the trial court to enter a judgment based on the issues answered by the jury and those the court determines as a matter of law. As such, this evidence is not relevant to the controversy resolved by the jury, the evidence is best heard at a hearing after the verdict, and Texas Rule of Civil Procedure 270 does not apply.

### 3. Modification of the Policy

Sims argues that Liberty failed to present admissible evidence establishing that Liberty and Chesapeake mutually consented to the subsequent modification of the policy and the corresponding reduction of the UIM limits. Therefore, his argument continues, Liberty is barred from contending the UIM limits are less than the $1,000,000.00 listed in the Business Auto Declarations originally produced. This argument presupposes that discrepancies between Liberty's initial discovery responses pertaining to the Chesapeake policy and later amended through supplementation created a fact issue on whether the UIM limits had been "effectively modified."

Sims correctly states he had the burden to prove the existence of an insurance policy that provided UIM benefits. *See **In re Reynolds***, 369 S.W.3d at 652. However, when Liberty sought to offer the remaining portions of the subject policy, including Amendatory Endorsement 2610A, the court sustained Sims's objections that the offered documents had not been properly authenticated. This effectively prevented Liberty from presenting any evidence to the jury about the terms of the policy. Sims cites numerous cases in his brief supporting the premise that notwithstanding the unambiguous language of Amendatory Endorsement 2610A, Liberty was required to prove the elements of contract modification by showing Chesapeake agreed to this endorsement and that consideration was given for the endorsement. *See, e.g., **Hathaway v. General Mills, Inc.***, 711 S.W.2d 227, 228 (Tex. 1986). These cases are not applicable here.

As set forth above, the trial court was required to determine the UIM coverage limits in the Chesapeake policy as a matter of law. Neither party pleaded fraud or any other theory that would bring the validity of the policy into question. Sims offered a portion of the policy into evidence and objected to introduction of Amendatory Endorsement 2610A, which modified the schedule of UIM coverage limits upon which he relied. Liberty obtained the admission of the policy, including the relevant endorsements and schedules, at a pretrial hearing as part of the record for the court's consideration. As we have stated, the policy was properly before the court. The policy and amendatory endorsement were unambiguous, and the trial court should have construed them together to determine the applicable UIM coverage limits as a matter of law. Therefore, Liberty had no obligation to prove the elements of contract formation or modification.

11

### 4. Conclusion

After review of the unambiguous language of the Chesapeake policy, which was properly before the court, we hold that the applicable UIM coverage limits were $250,000.00 as a matter of law and the trial court erred in submitting the UIM policy limits issue to the jury. We cannot say that the error was harmless because the trial court awarded $1,000,000.00 to Sims, which was predicated on the erroneous submission of the issue to the jury and its subsequent finding that UIM coverage limits were $1,000,000.00. *See GTE Mobilnet of S. Tex. Ltd. P'ship v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 290 (Tex. App.—Houston [1st Dist.] 1997, writ denied).

Liberty's first and second issues are sustained.

### IMPROPER INJECTION OF UIM COVERAGE LIMITS

In its fourth issue, Liberty argues that allowing the jury to hear evidence that the UIM policy limits were $1,000,000.00 improperly injected insurance into the proceedings, thereby tainting the award of damages by the jury.

### Standard of Review

We review the improper admission of evidence under an abuse of discretion standard. The test for determining an abuse of discretion is whether the trial court acted without reference to any guiding rules and principles. *See Downer*, 701 S.W.2d at 241-42. Stated differently, a trial court abuses its discretion if its decision is arbitrary and unreasonable. *Id.* at 242. Under this standard, an appellate court may not substitute its judgment for that of the trial court. *Walker v. Packer*, 827 S.W.2d 833, 839-40 (Tex. 1992) (orig. proceeding).

A trial court has no discretion in determining what the law is or applying the law to the facts. *Walker*, 827 S.W.2d at 840. The appellate court should uphold the trial court's ruling if the record shows any legitimate basis supporting that ruling. *Enbridge Pipelines (E. Tex.) L.P. v. Avinger Timber, LLC*, 386 S.W.3d 256, 264 (Tex. 2012); *Serv. Corp. Int'l v. Guerra*, 348 S.W3d 221, 235 (Tex. 2011).

### Applicable Law

Evidence that a defendant was or was not insured against liability is not admissible on the issue of negligence. TEX. R. EVID. 411. This prohibition exists, at least in part, to avoid informing the jury that someone other than the defendant may be liable to pay damages.

***Thornhill v. Ronnie's I-45 Truck Stop, Inc***., 944 S.W.2d 780, 794 (Tex. App.—Beaumont 1997, writ dism'd by agr.). The probative value of such evidence is vastly outweighed by the danger of unfair prejudice. ***In re Reynolds***, 369 S.W.3d at 653.

The mention of insurance before a jury is not always reversible error. ***Univ. of Tex. v. Hinton***, 822 S.W.2d 197, 201 (Tex. App.—Austin 1991, no writ). To demonstrate reversible error, the party appealing must show (1) that the reference to insurance probably caused the rendition of an improper judgment in the case; and (2) that the probability that the mention of insurance caused harm exceeds the probability that the verdict was grounded on proper proceedings and evidence. ***Dennis v. Hulse***, 362 S.W.2d 308, 309 (Tex.1962). The record as a whole must show harm to the complaining party. *See **Canyon Vista Prop. Owners Ass'n, Inc. v. Laubach***, No. 03-11-00404-CV, 2014 WL 411646, at \*8 (Tex. App.—Austin Jan. 31, 2014, no pet.) (mem. op.).

**Discussion**

As we have stated, the trial court should have determined, as a matter of law, that Chesapeake's UIM coverage limits were $250,000.00. Therefore, the trial court erred in allowing Sims to state his position on the amount of UIM limits in his opening statement, to introduce any portion of the Chesapeake policy that contained UIM coverage limits, and to offer Liberty's discovery responses that referenced UIM coverage limits.

Sims cites this court's opinion in ***In re Reynolds*** for the premise that he could not satisfy his burden without establishing the existence of UIM coverage, which required him to present evidence of the UIM coverage limits. *See **In re Reynolds***, 369 S.W.3d at 652. This assertion is incorrect. We held only that the plaintiff in a UIM contractual case had the burden to establish that a policy of automobile insurance providing UIM benefits existed. *See **id.*** We pointed out that detailed evidence of insurance is prejudicial in the simultaneous trial of two claims when evidence of liability insurance would be admissible as to only one of the claims. ***Id.*** at 653. Because the plaintiff has the burden to prove the existence of UIM coverage, injection of insurance is unavoidable in UIM cases. But that does not mean evidence of the UIM coverage limits is admissible.

It is true that the use of the term "underinsured" in connection with references to the other motorist involved in the incident implies that the other motorist was covered by automobile liability insurance. But evidence of Knous's liability limits in this case would not have been

admissible under Rule 411. One reason for not allowing evidence of the other motorist's liability limits is to prevent the jury from knowing the threshold over which the UIM carrier may have a contractual obligation to pay. The same reasoning applies to the introduction of UIM policy limit amounts, because the jury's knowledge of that amount could affect its damages verdict.

The only issues a jury in a UIM contractual case should answer under these facts are liability and damages. Thus, it logically follows that evidence of the amount of the other motorist's automobile liability limits, as well as the plaintiff's UIM coverage limits, is immaterial to the issues for the jury, and should not be admitted over a proper objection. In this case, Liberty filed a motion in limine seeking to exclude any reference to UIM coverage limits in the Chesapeake policy. It also objected to the offer of evidence of UIM coverage limits in both the Chesapeake policy and in Liberty's discovery responses.

But even if the existence of UIM coverage benefits was probative to establish the existence of UIM benefits available to Sims, the UIM coverage limits were not. In fact, evidence of UIM coverage limits was prejudicial to the extent it may have had a bearing on the jury's damage verdict. By allowing introduction of the UIM coverage limits, and particularly the much larger incorrect amount, the trial court abused its discretion. Accordingly, we cannot say that the trial court's error was harmless.

Liberty's fourth issue is sustained.


## DISPOSITION[6]

The trial court erred when it failed to determine that the UIM coverage limits under the Chesapeake policy were $250,000.00 as a matter of law, and instead submitted the issue to the jury. Furthermore, the trial court erred in allowing Sims to present evidence of the UIM coverage limits to the jury, especially since it allowed Sims to offer evidence of the incorrect amount of coverage. Neither error was harmless. Accordingly, we *reverse* the trial court's judgment, and *remand* the case for a new trial on damages only. *See* TEX. R. APP. P. 44.1(a)(1).

---

[6] In its third issue, Liberty conditionally argues that the trial court erred when it allowed Sims to offer evidence that the Chesapeake policy UIM liability limits were $1,000,000.00, but denied Liberty's request under the rule of optional completeness to have the amendatory endorsements read to the jury and admitted into evidence showing UIM limits of $250,000.00 under the policy. *See* TEX. R. EVID. 106, 107. Since we have sustained Liberty's first, second, and fourth issues, we need not address this issue. *See* TEX. R. APP. P. 47.1.

14

Opinion delivered December 3, 2015.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

### DECEMBER 3, 2015

### NO. 12-14-00123-CV

**LIBERTY MUTUAL INSURANCE COMPANY,**
Appellant
V.
**RICKIE SIMS,**
Appellee

Appeal from the 273rd District Court
of Shelby County, Texas (Tr.Ct.No. 13CV32,286)

THIS CAUSE came to be heard on the appellate record and the briefs filed herein, and the same being considered, because it is the opinion of this court that there was error in the judgment of the court below, it is ORDERED, ADJUDGED and DECREED by this court that the judgment be **reversed** and the cause **remanded** to the trial court **for a new trial** on damages only, and that all costs of this appeal are hereby adjudged against the Appellee, **RICKIE SIMS,** in accordance with the opinion of this court; and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*